IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| D-M-S HOLDINGS, INC., | ) | |
| | ) | NO. _____ |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| VERIDIAN HEALTHCARE, | ) | **COMPLAINT AND JURY DEMAND** |
| LLC, STEVEN M. BISULCA, and | ) | |
| MICHAEL MAZZA, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff D-M-S Holdings, Inc. ("DMS"), by and through its attorneys and for its Complaint and Jury Demand against Defendants Veridian Healthcare, LLC, Steven M. Bisulca and Michael Mazza, alleges as follows:

## PARTIES

1.     Plaintiff D-M-S Holdings, Inc. ("DMS") is incorporated in the State of Delaware with its principal place of business in Waukegan, Illinois.

2.     DMS was formed in 2004 by Briggs Medical Service Company ("Briggs") after Briggs purchased the stock of Mabis Healthcare Holdings, Inc., based in Illinois, and Duro-Med Industries, Inc., based in Georgia.

3.     DMS has continuously conducted business from the United States since 2004 under its own name and under the fictitious names of Mabis Healthcare ("Mabis") and Duro-Med Industries ("DMI").

4.     Defendant Veridian Healthcare, LLC ("Veridian") is a limited liability company formed in Illinois in January 2009, with its principal place of business in Waukegan, Illinois.

5.     Defendant Steven M. Bisulca ("Bisulca")  is an adult resident of the State of Illinois believed to be residing in Lake Bluff, Lake County, Illinois and is believed to be a member of Veridian.

6.     Defendant Michael Mazza ("Mazza") is an adult resident of the State of Illinois believed to be residing in Lake Forest, Lake County, Illinois, and is believed to be a member of Veridian.

## JURISDICTION AND VENUE

7.     This Court has personal jurisdiction over Defendants because they resided in Illinois when this cause of action arose, because the Employment Agreements (as set forth below) were made and to be performed in Illinois, and because all or some of the conduct at issue occurred  in Illinois.

8.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c).

## BACKGROUND INFORMATION FOR ALL COUNTS

### Defendants' infringement on certain of plaintiff's copyrights and trade dress

10.     DMS manufactures, distributes, markets, and sells a number of consumer-oriented medical supplies and medical equipment products through various channels of trade, including but not limited to, private label arrangements with national and regional "big box stores," and other nationally recognized retail outlets.

11.     After its formation in 2004, DMS continued to use the fictitious trade names of Mabis and DMI and continued to use the trademark Smartread® for certain of its product lines.

12.     Over the past five years, more than a quarter of a million units of Smartread® digital blood pressure monitors have been sold by DMS in interstate commerce.

13.     DMS devotes substantial effort, time, and resources in designing its packaging and graphics for its products, including but not limited to the digital blood pressure monitors, as these are important elements in the marketing of products because they serve to distinguish the product from others and represent and convey the product's quality and value to the consumer.

14.     In late 2006, DMS developed special packaging for the Smartread® digital blood pressure monitor for sale in Aldi, Inc. ("Aldi"), retail stores across the nation.   An image of the packaging of the Smartread® digital blood pressure monitor developed by DMS for Aldi is attached as Exhibit A (the "Mabis-Aldi Monitor Package").

15.     Since that time, DMS has been the owner of the trade dress of the packaging of the Mabis-Aldi Monitor Package.

16.     The Mabis-Aldi Monitor Package trade dress is inherently distinctive.

17.     Defendants own no rights in any elements of DMS' trade dress, including any elements of DMS' Mabis-Aldi Monitor Package trade dress.

18.     DMS is also the owner of the copyright in the Mabis-Aldi Monitor Package.

19.     DMS registered its claim of copyright in the Mabis-Aldi Monitor Package. The United States Copyright Office granted Certificate of Registration No. VA 1-690-258 with an effective date of November 23, 2009. A copy of this registration certificate is attached as Exhibit B.

20.     Inside the box of the Mabis-Aldi Monitor Package are certain other documents, to which DMS also owns the copyright.  These include:  (a) an Instruction Manual (the "Mabis-Aldi Monitor Instruction Manual"), a copy of which is attached as Exhibit C; (b) the Quick Start

Guide (the "Mabis-Aldi Monitor Quick Start Guide"), a copy of which is attached as <u>Exhibit D</u>; and a Smart Read Technology Brochure (the "Mabis-Aldi Monitor Brochure"), a copy of which is attached as <u>Exhibit E</u>.

21.     The works shown in <u>Exhibits C, D and E</u> were created and copyrighted by DMS in 2006.

22.     DMS registered its claim of copyright in the Mabis-Aldi Monitor Instruction Manual, the Mabis-Aldi Monitor Quick Start Guide, and the Mabis-Aldi Brochure. The United States Copyright Office granted Certificates of Registration Nos. TX 6-993-404, TX 6-997-969 and TX 6-993-408.  Copies of these registration certificates are attached as <u>Exhibit F, G and H</u>.

23.     In early 2009, the Defendants began to sell a competing digital blood pressure monitor to Aldi (the "Veridian-Aldi Monitor").

24.     The package of the Veridian-Aldi Monitor infringes on DMS' trade dress of the Mabis-Aldi Monitor Package.   An image of the Defendants' package for the Veridian-Aldi Monitor is attached as <u>Exhibit I</u>.

25.     The package of the Veridian-Aldi Monitor also infringes on DMS' copyright of the Mabis-Aldi Monitor Package.

26.     Inside the box of the Veridian-Aldi Monitor are an Instruction Manual, a Quick Start Guide and a Brochure that infringe on DMS' copyrights in the Mabis-Aldi Monitor Instruction Manual, the Mabis-Aldi Monitor Quick Start Guide and the Mabis-Aldi Monitor Brochure.   Copies of Defendants' Veridian-Aldi Monitor Instruction Manual, Veridian-Aldi Quick Start Guide and the Veridian-Aldi Brochure are attached as <u>Exhibits J, K, and L</u>.

27.     DMS sells an instant ice compress product (the "DMI Instant Ice Compress"). DMS owns the copyright in the instructions accompanying this product. This work was

completed in January 2009 and first published in May 2009. A copy of this work is attached as
Exhibit M.

28.     DMS registered its claim of copyright in the DMS Instant Ice Compress
instructions. The United States Copyright Office granted Certificate of Registration No. TX 6-
995-089 with an effective date of November 10, 2009.  A copy of this registration certificate is
attached as Exhibit N.

29.     By at least the Spring of 2009, the Defendants began to sell a competing instant
ice compress product (the "Veridian Instant Ice Compress").

30.     The instructions on the inner wrapping of the Veridian Instant Ice Compress
infringes on DMS' copyright rights in the instructions for the DMS Instant Ice Compress
product.  An image of the inner wrapping of the Veridian Instant Ice Compress is attached as
Exhibit O.

Employment of Defendant's Bisulca and Mazza

31.     Effective May 4, 2004, Defendants Bisulca and Mazza entered into Employment
Agreements with DMS pursuant to the sale of their business to DMS, under which the
Defendants became Officers of DMS; they were the highest ranking officers of DMS at the
Waukegan, Illinois location.   Copies of the Employment Agreements are attached hereto as
Exhibits P and Q.

32.     Effective June 1, 2006, DMS and Defendants Bisulca and Mazza amended said
Employment Agreements via the First Amendment to Employment Agreement, copies of which
are attached hereto as Exhibits R and S.

33.     Among other things, the Employment Agreements, including as amended,
provided that Defendants Bisulca and Mazza:  (a) during the term of their employment, would

not engage in any other business activity that would materially interfere with the performance of their duties as employees of DMS; (b) before and after their employment, would protect and hold in the strictest confidence confidential and proprietary information of DMS; and (c) during the term of their employment, would not participate in a competing business or solicit any employees, customers, or suppliers of DMS.

34.     During the summer and early fall of 2008, executives of DMS and its parent company met with Defendants Bisulca and Mazza individually to discuss employment arrangements following the expiration of their Employment Agreements on December 31, 2008.

35.     By letter dated September 10, 2008, Defendant Bisulca was formally notified that his Employment Agreement would not be renewed when it expired on December 31, 2008.

36.     By letter dated September 22, 2008, Defendant Mazza was formally notified that his Employment Agreement would not be renewed when it expired on December 31, 2008; however, some discussions about employment continued after that date.

37.     Defendant Mazza notified executives of DMS and its parent company, Briggs, via a faxed letter on November 7, 2008 that "I will serve out my current contractual term as President and COO of Mabis/DMI through December 31, 2008, and then resign my position effective January 1, 2009."

38.     Defendants' employment with DMS ended on December 31, 2008.

Defendants Bisulca's and Mazza's Actions Near the End of Their Employment

39.     From June 2008 through August 2008, Defendant Bisulca forwarded, or had his assistant forward on his behalf, approximately 15 emails to his personal/home email address from his DMS email account.

40.     From September 2008 through December 2008, Defendant Bisulca forwarded, or had his assistant forward on his behalf, many more emails—approximately 58—to his personal/home email address from his DMS email account.

41.     Included among the emails Defendant Bisulca had forwarded from DMS' account to his home/personal account from September 2008 through December 2008 were detailed DMS sales reports, DMS' customer and supplier information, opportunities for DMS to quote business, and other DMS confidential business information, business opportunities, and trade secrets.

42.     Defendant Bisulca, and two other employees working in DMS' supply chain, attended at DMS' expense and as a representative of DMS, Medica, a major supply sourcing show for the medical services industry, in Germany in mid-November 2008.

43.     Except for one meeting, Defendant Bisulca refused to attend customer/supplier meetings, or walk the trade show floor, with DMS' other two employees at the Medica show in November 2008.

44.     Shortly before he left DMS' employment, Defendant Bisulca and his assistant spent several days shredding documents from his office.

45.     After Defendant Mazza departed, DMS discovered that binders on the shelves in his office that had contained current customer information were missing and had been replaced with binders of information that was several years old and of limited usefulness to DMS.

Defendants Bisulca's and Mazza's Actions in January 2009

46.     On January 23, 2009, Defendant Bisulca's uncle, Jerry Lisman registered the web domain name of "veridianhc.com."

47.     Lisman had been employed by DMS as a Vice President of Marketing for Mabis products, working remotely from a Pennsylvania location, until his employment was terminated, effective December 31, 2008, due to a reorganization of the marketing unit for Mabis products.

48.     Upon DMS' information and belief, Lisman is working for Defendants' new company, Veridian Healthcare, LLC.

49.     On January 26, 2009, Defendants Bisulca and Mazza filed notification of the formation of their new business entity, Veridian Healthcare LLC, with the Illinois Secretary of State, and listed themselves as Managers of the LLC.

Aldi and Dollar General

50.     Among the emails forwarded by or for Defendant Bisulca from DMS to Defendant Bisulca's personal/home email address is an October 23, 2008 email that included a letter made out to DMS, dated and faxed that same day, in which DMS was invited to submit a quote by November 6, 2008 in order to continue to supply Aldi stores with automatic digital blood pressure monitors.

51.     Also among the emails forwarded by or for Defendant Bisulca from Defendant Bisulca's DMS email to his personal/home email is an October 23, 2008 email that included Aldi's 2009 plans for promotions of DMS-supplied products.

52.     DMS had been supplying Aldi with DMS-made or DMS-sourced healthcare products for several years and had the capacity and intention to continue to do so in 2009.

53.     If DMS had continued its relationship with Aldi for automatic digital blood pressure monitors, pursuant to the October 23rd request to quote, the first scheduled delivery under that contract was to be on January 25, 2009.

54.     DMS submitted its quote to Aldi for automatic digital blood pressure monitors, for January 2009 delivery, by Aldi's November 6, 2008 deadline.

55.     In early 2009, DMS was advised by Aldi that this contract for automatic digital blood pressure monitors was awarded to Veridian Healthcare, LLC, the company formed by Defendants Bisulca and Mazza.

56.     Given the timing of these events regarding this Aldi business, Defendants Bisulca and Mazza would have had to submit a quote to compete with DMS in November 2008, which was during the course of their employment with DMS.

57.     Also among the emails forwarded by or for Defendant Bisulca from DMS to Defendant Bisulca's personal/home email address on September 19, 2008 was an email from Russ Ringstrand, former Senior Vice President of Sales/Consumer Division at DMS, dated August 20, 2008, which included a "Consumer Sales Report" with detailed annual sales history of all DMS' consumer products customers from 2005 through July 2008, and expectations for 4th Quarter 2008 and 1st Quarter 2009 sales.

58.     This "Consumer Sales Report" contained special notes of sales intelligence and future sales opportunities for five of the hundreds of customers on the report, including Aldi and Dollar General.

59.     Upon information and belief, DMS lost a significant portion of its Aldi and Dollar General business to Defendants Bilulca's and Mazza's new company, Veridian Healthcare, within the first two months of 2009.

60.     When employed by DMS, Defendant Bisulca was responsible for supplier relationships, including obtaining products to sell to DMS' customers and maintaining adequate supplies in DMS' inventory to meet product sales demands.

61.     In December 2008, Defendant Bisulca failed to place orders for products DMS needed in order to continue to meet its obligations to its customers.

62.     In January 2009, DMS discovered that Defendant Bisulca had not placed adequate purchase orders in December 2008 to cover known future inventory needs for customers in the first quarter of 2009, including Dollar General.

63.     Because of Defendant Bisulca's failure to order sufficient product in December 2008, DMS had to backorder Dollar General goods in February and March of 2009.

Shanghai INTCO and PSS

64.     In 2008, DMS began exploring alternative suppliers of hot/cold packs it sold to Physician Sales Services ("PSS"), which PSS then sold to retailers.

65.     One of the alternative suppliers of hot/cold packs that DMS approached was a Pacific Rim-based company called Shanghai INTCO.

66.     In furtherance of this relationship, Shanghai INTCO and DMS shared information including product specifications, audits, self-assessments, current customer bases, price quotes, and product samples.

67.     After Defendant Mazza left DMS, DMS was unable to locate information about Shanghai INTCO, and some of the Shanghai INTCO product samples, that Defendant Mazza previously maintained in his office at DMS' facility in Waukegan, Illinois.

68.     On January 13, 2009, PSS notified DMS that DMS was being awarded some of PSS hot/cold pack business.

69.     A few weeks later, PSS informed DMS that it had received pricing from a new company and that the award of hot/cold pack business to DMS was on hold.

70.     Upon DMS' information and belief, Defendant Bisulca visited Shanghai INTCO in or around February 2009.

71.     DMS and Shanghai INTCO entered into a restricted supplier relationship around March 2009 wherein Shanghai INTCO agreed not to supply products to DMS competitors such as Veridian Healthcare, LLC.

72.     Shanghai INTCO has told DMS that it advised Defendant Bisulca at Veridian on March 13, 2009 that it would be unable to supply Veridian due to a conflict of interest.

73.     Shanghai INTCO has told DMS that Defendant Bisulca sent an email to Shanghai INTCO on March 15, 2009, asking it to reconsider doing business with Veridian because Veridian had a commitment from a buyer to purchase ice packs from it and it was just waiting final approval, which was expected in early April 2009.

74.     Shanghai INTCO has told DMS that Defendant Bisulca's March 15, 2009 email to Shanghai INTCO is referring to Veridian's potential business with PSS.

75.     Shanghai INTCO has told DMS that Shanghai INTCO did not respond to Defendant Bisulca's March 15, 2009 email.

76.     Shanghai INTCO has told DMS that Defendant Bisulca sent another email to the President of Shanghai INTCO on March 17, 2009, making the following false and negative statements about DMS:

A.      Defendant Bisulca said that DMS had already lost PSS' hot/cold pack business and would soon lose the rest of PSS' business;

B.      Defendant Bisulca said that DMS had no sales department because a key player had left (i.e., Steve Scherer, DMS' former Vice President of Medical Sales); and

    C.    Defendant Bisulca asked how DMS was going to protect Shanghai INTCO's business with no sales force and all of DMS' key people gone, and why Shanghai INTCO would agree to a private label agreement with a company like DMS that was destined to fail.

77.    Steve Scherer resigned his employment with DMS in February 2009, and upon DMS' information and belief, Scherer went to work for Defendants Bisulca and Mazza at Veridian; however, DMS had not lost its entire sales department, nor all of its key sales people.

78.    Upon DMS' information and belief, Defendants Bisulca and Mazza, via Veridian, went to Rapid Aid to obtain hot/cold packs to sell to PSS after it was unable to strike a deal with Shanghai INTCO.

79.    In May 2009, DMS was informed that PSS awarded its hot/cold pack business to RapidAid.

Solicitation of Employees

80.    On or about December 15, 2008, Defendants Bisulca and Mazza announced to their staff that they would be leaving DMS' employment at the end of the year.

81.    Before leaving employment, Defendants Bisulca and Mazza led their staff to believe their jobs at DMS were in jeopardy, with statements such as "Briggs is taking the company into the ground."  [Briggs is Briggs Medical Service Company, the parent company of DMS, which purchased DMS in 2004.]

82.    Before leaving employment, Defendants Bisulca and Mazza solicited selected DMS staff members by saying such things as "someday, hopefully, we'll cross paths with you again."

83.     On January 5, 2009, DMS' Senior Vice President of Sales/Consumer Division, Russ Ringstrand, announced that he was resigning from DMS; while he would not say where he was going, Ringstrand said he might start a new company.

84.     Upon DMS' information and belief, Ringstrand works with Defendants Bisulca and Mazza, and may be a Member of Defendants' new company, Veridian.

85.     Upon DMS' information and belief, other employees of DMS have left their employment at DMS to work with Defendants Bisulca's and Mazza's new company, Veridian, after Defendants' Bisulca's and Mazza's statements about DMS' alleged bleak future and statements of solicitation, including such former DMS employees as Casey Guznickzak, Carrie Booton, Deanna Vlach, Steve Scherer, and Rick Shutter.

### B. Braun

86.     B. Braun Medical, Inc. ("B. Braun"), located in Bethlehem, Pennsylvania, is a significant customer of DMS, purchasing medical products such as glass syringes and prep sponges.

87.     From January 1, 2007 through October 31, 2009, DMS received in excess of $13,500,000.00 in revenue from its sales to B.Braun.

88.     Defendant Mazza was DMS' primary contact for the B. Braun account until December 31, 2008.

89.     Defendant Mazza kept notebooks of DMS' confidential information about DMS' relationship with B. Braun (e.g., requests for proposals, bid responses, pricing, contracts) in his office while he was employed at DMS.

90.     After Defendant Mazza departed from DMS on December 31, 2008, DMS discovered that the notebooks containing DMS' confidential information about B. Braun for the two most recent years, which should have been in his office, were missing.

91.     DMS' three-year contract with B. Braun was set to expire at the end of 2009.

92.     On March 17, 2009, DMS received B. Braun's request for proposal (RFP) to renew their business agreement.

93.     Upon information and belief, Defendant Mazza met with B. Braun in March 2009.

94.     On March 27, 2009, DMS submitted a bid in response to the B. Braun RFP, with the expectation that the relationship would continue because of a positive history in performance on the current contract.

95.     Tom Young, CFO of Briggs and former executive at B. Braun, met with B. Braun about the DMS bid on April 17, 2009.

96.     During this meeting, B. Braun told Mr. Young it had "heard" DMS was closing its warehouse in Scranton/Wilkes Barre, Pennsylvania—the warehouse from which DMS supplied B. Braun.

97.     The proximity of DMS' Pennsylvania warehouse to B. Braun is one of DMS' competitive advantages in its relationship with B. Braun, and was part of the reason DMS' was able to maintain high performance under the B. Braun contract.

98.     DMS had recently renewed its lease for the Pennsylvania warehouse for another five years.

99.     Mr. Young advised B. Braun that the information it had "heard" about DMS closing that warehouse was false, but the B. Braun representatives appeared unconvinced.

100.   DMS representatives John Carr and Tony D'Antonio met with B. Braun on April 27, 2009.

101.   The B. Braun representatives were unexpectedly hostile toward DMS and asked DMS unusual questions, such as who its "expert" was for glass syringes, and who at DMS had been to the Asian factory making the glass syringes.

102.   Defendant Mazza had previously serviced B. Braun and sourced glass syringes for B. Braun when he was employed by DMS.

103.   The questions about glass syringes were unusual because DMS had been a reliable source of quality glass syringes to B. Braun for over two years, and DMS had not changed its manufacturer for that product.

104.   Based on the negotiations, DMS submitted a final re-bid on May 8, 2009 for the B. Braun RFP for a three-year contract, which bid assumed gross sales revenues to DMS estimated around $17,000,000.00.

105.   On June 26, 2009, B. Braun notified DMS that the bid had not been awarded to DMS, and B. Braun's relationship with DMS would end on December 31, 2009.

106.   B. Braun's email notification indicated its decision was based on quality, unit cost, stability of pricing, assurance of supply, inventory programs, and customer service, and DMS felt is should have been a leader in each of these factors.

107.   Tom Young called B. Braun to understand better why DMS had not been awarded the bid on the new three-year contract.

108.   B. Braun told Mr. Young that although DMS had submitted the lowest bid (based on the second bid submitted by DMS), "price was not a factor" in B. Braun's decision; rather, "customer service" and the "continuing ability to provide product" were.

109.    B. Braun further told Mr. Young it viewed Defendant Mazza, not DMS, as the "incumbent" on the contract.

110.    DMS believes Defendants provided B. Braun with false information about DMS, including the false information about DMS' Pennsylvania warehouse being closed, and engaged in unfair competition, in order to damage DMS' relationship with B. Braun.

## COUNT 1: FEDERAL UNFAIR COMPETITION (TRADE DRESS) AGAINST ALL DEFENDANTS
### Lanham Act § 43(a), 15 U.S.C. § 1125(a)

111.    DMS realleges Paragraphs 1 through 110 of this Complaint as though fully alleged and incorporated herein.

112.    Defendants' copying of Mabis-Aldi Monitor Package is likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association of Defendants with DMS, or as to the origin, sponsorship, or approval of Defendants' goods, services, or commercial activities by DMS.

113.    Defendants' actions constitute unfair competition, false designation of origin, and palming off in violation of the Lanham Act § 43(a), 15 U.S.C. § 1125(a).

114.    Defendants' infringement has been willful, and that willful infringement has caused, and will continue to cause, irreparable harm to DMS unless permanently enjoined.

115.    Defendants' unlawful actions are profiting and will continue to profit Defendants.

116.    Defendants' actions are causing and will cause DMS monetary damage in amounts presently unknown but to be determined at trial.

## COUNT 2: FEDERAL COPYRIGHT INFRINGEMENT
## AGAINST ALL DEFENDANTS
### (17 U.S.C. § 101, *et seq.*)

117.    DMS realleges Paragraphs 1 through 110 of this Complaint as though fully alleged and incorporated herein.

118.    Defendants' copying of the Mabis-Aldi Monitor Package, of the Mabis-Aldi Instruction Manual, the Mabis-Aldi Quick Start Guide, the Mabis-Aldi Monitor Brochure, and the DMI Instant Ice Compress  constitute separate acts of infringement.

119.    Defendants' infringement is a violation of the exclusive rights of DMS as the owner of the copyrights, and should therefore be enjoined.

120.    Defendants' unlawful actions are profiting and will continue to profit Defendants.

121.    Defendants' actions are causing and will cause DMS monetary damage in amounts presently unknown but to be determined at trial.

## COUNT 3: VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES
## ACT AGAINST ALL DEFENDANTS
### (815 ILCS § 510/1, *et seq.*)

122.    DMS realleges the allegations in Paragraphs 1 through 110 of this Complaint as though fully alleged and incorporated herein.

123.    At all relevant times, the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA") was in effect in Illinois.

124.    Defendants' copying of the Mabis-Aldi Monitor Package constitutes a violation of Section 2 of the IUDTPA, in that it is likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association of Defendants with DMS, or as to the origin, sponsorship, or approval of Defendants' goods, services, or commercial activities by DMS.

125.    Defendants' infringement has caused, and will likely continue to cause, harm to DMS unless permanently enjoined, pursuant to 815 ILCS § 510/3.

126.    Defendants' unlawful actions are profiting and will continue to profit Defendants.

127.    Defendants' actions are causing and will cause DMS monetary damage in amounts presently unknown but to be determined at trial.

128.    Defendants' willful conduct entitles DMS to a recovery of its costs and attorney's fees pursuant to 815 ILCS § 510/3.

## COUNT 4: VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT AGAINST ALL DEFENDANTS
### (815 ILCS § 505/1, *et seq.*)

129.    DMS realleges the allegations in Paragraphs 1 through 110 of this Complaint as though fully alleged and incorporated herein.

130.    At all relevant times, the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act") was in effect in Illinois.

131.    Defendants' copying of the Mabis-Aldi Monitor Package constitutes a violation of Section 2 of the IUDTPA, in that it is likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association of Defendants with DMS, or as to the origin, sponsorship, or approval of Defendants' goods, services, or commercial activities by DMS.

132.    Defendants' violation of Section 2 of the IUDTPA also constitutes a violation of Section 2 of the Consumer Fraud Act.

133.    Defendants' violation of the Consumer Fraud Act has caused, and will likely continue to cause, harm to DMS unless permanently enjoined.

134.    Defendants' unlawful actions are profiting and will continue to profit Defendants.

135.    Defendants' actions are causing and will cause DMS monetary damage in amounts presently unknown but to be determined at trial, including but not limited to attorney's fees and costs, pursuant to 815 ILCS § 505/10a.

136.    Defendants' willful conduct entitles DMS to a recovery of its actual damages, costs, attorney's fees, and punitive damages pursuant to 815 ILCS 505/10a.

### COUNT 5: VIOLATION OF ILLINOIS TRADE SECRETS ACT AGAINST ALL DEFENDANTS
### (765 ILCS § 1065/1, *et seq.*)

137.    DMS realleges the allegations in Paragraphs 1 through 110 of this Complaint as though fully alleged and incorporated herein.

138.    Defendants Bisulca and Mazza had access to DMS' trade secrets, including information such as its technical or non-technical data, compilations, programs, methods, techniques, processes, financial data, and lists of actual and potential customers or suppliers, which information is sufficiently secret and has economic value by not being generally known to other persons who could obtain economic value from its disclosure or use, and which information is the subject of reasonable efforts by DMS to maintain its secrecy or confidentiality.

139.    Defendants Bisulca and Mazza misappropriated DMS' trade secrets by acquiring DMS' trade secrets by improper means.

140.    Defendants Bisulca and Mazza misappropriated DMS' trade secrets by disclosing or using DMS' trade secrets without DMS' express or implied permission at a time when they knew they had acquired the trade secrets by improper means and under circumstances that imposed on them a duty to maintain the secrecy of DMS' trade secrets.

141.    Defendants Bisulca, Mazza and Veridian used and continue to use the trade secrets they misappropriated from DMS in their business.

142.   Defendants' trade secret misappropriation has caused, and will continue to cause, irreparable harm to DMS unless permanently enjoined.

143.   Defendants' use of DMS' trade secrets in their business was the proximate cause of damage to DMS.

## COUNT 6: BREACH OF CONTRACT
## AGAINST DEFENDANTS BISULCA AND MAZZA

144.   DMS realleges the allegations in Paragraphs 1 through 110 of this Complaint as though fully alleged and incorporated herein.

145.   Defendants Bisulca and Mazza breached their obligations to DMS to protect its confidential information.

146.   Defendants Bisulca and Mazza breached their obligations not to compete with DMS during the course of their employment at DMS.

147.   Defendants Bisulca and Mazza breached their obligations not to solicit DMS' employees, customers, or suppliers during the course of their employment at DMS.

148.   Defendants Bisulca's and Mazza's breaches of their Employment Agreements have caused, and will continue to cause, irreparable harm to DMS unless permanently enjoined.

149.   Defendants Bisulca's and Mazza's breaches of their Employment Agreements were the proximate cause of damages to DMS.

## COUNT 7: BREACH OF FIDUCIARY EMPLOYMENT DUTIES
## AGAINST DEFENDANTS BISULCA AND MAZZA

150.   DMS realleges the allegations in Paragraphs 1 through 110 of this Complaint as though fully alleged and incorporated herein.

151.    As officers and key employees of DMS, Defendants Bisulca and Mazza owed DMS duties of loyalty, and good faith and fair dealing, which required them to act only in DMS' best interests and not in any manner that could injure DMS' financial or business interests.

152.    As officers and key employees of DMS, Defendants Bisulca and Mazza owed DMS a fiduciary duty to subordinate their personal interests to that of DMS.

153.    As officers and key employees of DMS, Defendants Bisulca and Mazza owed DMS a duty not to usurp its corporate opportunities for themselves.

> A.    DMS was financially able to undertake the corporate opportunities presented to it, including but not limited to business with Aldi and Dollar General.
>
> B.    The corporate opportunities presented by such customers as Aldi and Dollar General were within DMS' lines of business.
>
> C.    DMS was interested in the opportunities presented by customers such as Aldi and Dollar General.

154.    Defendants Bisulca and Mazza breached their fiduciary employment duties to DMS during the last seven months of their employment at DMS, which duties included duties of loyalty, good faith and fair dealing, to subordinate their personal interests to DMS' interests, and not to usurp DMS' corporate opportunities.

155.    Defendants' Bisulca's and Mazza's breach of each and/or all of these duties owed to DMS was the proximate cause of damage to DMS.

## COUNT 8: COMMERCIAL DEFAMATION
## AGAINST ALL DEFENDANTS

156.    DMS realleges the allegations in Paragraphs 1 through 110 of this Complaint as though fully alleged and incorporated herein.

157.   For its claim of commercial defamation *per se*, DMS alleges that Defendants Bisulca and Mazza, acting on behalf of Veridian, made statements about DMS to others, including DMS employees, B. Braun, and Shanghai INTCO, and imputed to DMS a lack of ability to perform in its business, or that otherwise prejudiced DMS in its business.

158.   For its claim of commercial defamation *per quod*, DMS alleges that Defendants Bisulca and Mazza, acting on behalf of Veridian, made false statements about DMS to others, including DMS employees, B. Braun, and Shanghai INTCO, and that such false statements were made with malice and tended to injure DMS' reputation, lower DMS' standing in the business community, or deter others from doing business with DMS.

159.   For its claim of commercial defamation *per se*, damages to DMS from Defendants' conduct is presumed.

160.   For its claim of commercial defamation *per quod*, Defendants' commercial defamation of DMS was the proximate cause of damage to DMS, which damages include an estimated loss in sales to B. Braun over the next three years of approximately $17,000,000.00.

## COUNT 9: INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS AGAINST ALL DEFENDANTS

161.   DMS realleges the allegations in Paragraphs 1 through 110 of this Complaint as though fully alleged and incorporated herein.

162.   DMS had existing business relationships that it reasonably expected to continue, including those with its employees and customers such as B. Braun, Aldi, and Dollar General.

163.   Defendants had knowledge of these existing business relationships of DMS and of DMS' reasonable expectancy to continue in them.

164.    Defendants intentionally and unjustifiably interfered with DMS' business relationships with the aim of preventing and injuring DMS' reasonable expectancies in the business relationships.

165.    Defendants' intentional interference with DMS' business relationships was the proximate cause of damages to DMS.

### RELIEF SOUGHT

WHEREFORE, Plaintiff DMS respectfully requests that the Court enter judgment in its favor and award the following relief:

A.    An injunction permanently enjoining and restraining each Defendant, and their officers, agents, subsidiaries, servants, partners, employees, attorneys, and all others acting in concert or participation with them:

(i)    from the manufacture, distribution, offering for sale, sale, advertising and/or promotion in the United States of digital blood pressure monitor products in product packaging that is confusingly similar to the Mabis-Aldi Monitor Package trade dress, or any other trademark or trade dress calculated or likely to cause confusion or mistake in the mind of the trade or public or to deceive the trade or public into believing that Defendants' business and products are in any way associated or affiliated with or related to DMS' lines of goods, or which infringe on any of DMS' copyrights.

(ii)    permanently requiring Defendants, to deliver up for destruction all labels, signs, prints, packaging, wrappers, and advertising or promotional materials in their possession or within their custody or control that bear any trade dress, package design, or designation in violation of DMS' rights, or which infringe on any of DMS' copyrights.

(iii)    from further use and disclosure of DMS' trade secrets and confidential information (pursuant to 765 ILCS § 1065/3), from publishing further commercially defamatory statements about DMS, and from interfering with DMS' business relationships.

B.    An award of damages as appropriate pursuant to 15 U.S.C. § 1117(a), including but not limited to actual damages, infringer's profits, appropriate multipliers, and attorney's fees and costs.

C.    An award of damages pursuant to 17 U.S.C. § 504(b), including but not limited to actual damages plus the infringer's profits.

D.    An award of attorney's fees pursuant to 815 ILCS § 510/3, as a result of Defendants' willful engagement in deceptive trade practices.

E.    An award of compensatory damages, punitive damages, court costs and attorney's fees pursuant to 815 ILCS § 505/10a.

F.    An award of compensatory damages for both DMS' actual losses and the unjust enrichment to Defendants by the misappropriation of DMS' trade secrets, plus application of appropriate multipliers and attorney's fees and costs as a result of Defendants' willful misappropriation, pursuant to 765 ILCS § 1065/4.

G.    An award of compensatory damages for Defendants Bisulca's and Mazza's breach of their Employment Agreements with DMS, for Defendants Bisulca's and Mazza's breach of their fiduciary employment duties to DMS, for all Defendants' commercial defamation of DMS, and for all Defendants' intentional interferences with DMS' business relationships.

H.    Punitive damages for Defendants Bisulca's and Mazza's breaches of their employment duties, and for all Defendants' commercial defamation of DMS and  intentional interferences with DMS' business relationships.

I.      An award of pre-judgment interest on all damages awarded, as allowed by law.

J.      Such other and further monetary and equitable relief as the Court deems just and

proper under the circumstances.

### JURY DEMAND

Plaintiff DMS hereby demands trial by jury on all claims raised to the extent allowed by law.

Date: December 11, 2009                     Respectfully submitted,

                                            /s/ David H. Levitt

Jill R. Jensen-Welch (Pro Hac admission     David H. Levitt
pending)                                    Evan D. Brown
DICKINSON,  MACKAMAN,  TYLER  &             HINSHAW & CULBERTSON, LLP
HAGEN, P.C.                                 222 N. LaSalle Street, Suite 300
699 Walnut Street, Suite 1600               Chicago, Illinois  60601
Des Moines, Iowa  50309-3986                Telephone:  (312) 604-3000
Telephone:  (515) 244-2600                  FAX:  (312)704-3001
FAX:  (515) 246-4550                        dlevitt@hinshawlaw.com
jjensen@dickinsonlaw.com                    ebrown@hinshawlaw.com


ATTORNEYS FOR PLAINTIFF D-M-S HOLDINGS, INC.